UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WYSONG CORPORATION,

      Plaintiff,

                                    Case No. 02-10173-BC

v.                                      Honorable David M. Lawson

M.I. INDUSTRIES d/b/a/ NATURES
VARIETY, and SCOTT FREEMAN,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Although it has been said that imitation is the highest form of flattery, Dr. Randy L. Wysong, a doctor of veterinary medicine, took offense when a former consultant, Scott Freeman, left the Wysong Corporation to join co-defendant M.I. Industries in developing and marketing a line of pet foods allegedly copying the "healthy pet diet" concept that Dr. Wysong developed.  Wysong Corporation filed a complaint in this Court alleging claims of misappropriation of trades secrets, conspiracy, unjust enrichment, breach of fiduciary duty, and deceptive packaging.  Wysong Corporation alleges that M.I. Industries and Freeman took unfair advantage of negotiations for the sale of Wysong Corporation by stealing trade secrets and creating a line of premium pet food that unfairly uses elements of Wysong Corporation's product trade dress.  Defendants M.I. and Freeman have filed a motion for summary judgment contending that Wysong Corporation's putative trade secrets are publically available, they had no access to the alleged trade secrets, the plaintiff's intellectual property rights are not protectable, they received no unjust benefit from the plaintiff, and they owed no duty to the plaintiff.  The defendants further argue that the misappropriation claim under Michigan's Uniform Trade Secrets Act (MUTSA) displaces all of the other claims, and there

is no genuine issue of material fact on any of the plaintiff's claims.  The motion does not challenge the plaintiff's claim based on a breach of duty of loyalty that was added by amendment after the defendants filed the motion.  The Court heard arguments from the parties in open court on September 11, 2003 and allowed supplemental filings thereafter.  The Court now finds that the defendants are entitled to judgment as a matter of law on the claims for misappropriation on grounds of pet food concepts, marketing information, packaging information, and customer information; breach of fiduciary duty as to defendant M.I. Industries; and confusingly similar trade dress. However, material fact issues preclude summary judgment on the claims of misappropriation of financial and supplier information; unjust enrichment; conspiracy; and breach of fiduciary duty as to Freeman.  Therefore, the Court will grant the defendants' motion in part and deny it in part.

## I.  Facts

Randy L. Wysong, D.V.M. holds himself out as a leading expert in the premium pet food industry.  He developed a "healthy pet diet" concept that consists of the idea of feeding animals with a rotating diet of a various of raw, fresh meats and vegetables instead of supplemented processed foods, which are common in the industry. Defs.' Br. Summ. J. Ex. 4, Wysong Corp. Sales Literature at 32; Defs.' Reply Br. Ex. 10, Dr. Wysong Dep. at 69-72.  Dr. Wysong has published extensively on the subject.  *Id*. at 69-70.  He owns the plaintiff Wysong Corporation, a company that manufactures pet foods adhering to his dietary precepts.  *Id*. at 37.  He teaches his concepts as a "logical framework," marketable to consumers.  *Id*. at 74.  Wysong Corporation developed special packaging procedures known as "fresh batching, oxygen and light barrier packaging, [and] natural oxidants" to protect the freshness of food sold to consumers.  *Id*. at 91-92. Among the plaintiffs products is a brand of horse food marketed as "Wysong Enhanced Forage."  Defs.' Mot. Summ. J.

-2-

Ex. 4, Wysong Corp. Sales Literature at 15.  The plaintiff has confidentiality agreements in place with each one of its suppliers, *Id*. at 118-119, and also requires employees to sign confidentiality agreements.  Defs.' Br. Summ. J. Ex. 4, E-mail to Scott Freeman (Sep. 13, 2000) at 68.

The defendant, Scott Freeman, acted as a consultant and a representative for the plaintiff from January 1998 through August 2001.  Freeman's consulting/sales agreement  provided that he would "assist Wysong Corporation with marketing, sales, and customers relations" beginning January 1, 1998.  He was to be paid a monthly consulting fee that diminished over time as his compensation was augmented by commissions.  He was identified as "an independent contractor not under the direct employment of [Wysong Corporation]."  Defs.' Supp. Br. Ex. 11, Consulting/Sales Agreement.

Freeman held himself out to be the plaintiff's "National Sales Manager."  Second Amended Compl. Ex. A, Facsimile from Freeman to Mulligan (Dec. 3, 2000).  The plaintiff provided Freeman marketing information, new product information, and customer and supplier information. Defs.' Reply Ex. 10, Dr. Wysong Dep. at 107-108, 119-20.  According to Dr. Wysong, he told Freeman in confidence about his intention to develop a line of premium pet food called "variety" and to describe a product with the term "Prairie Forage." *Id*. at  67-69, 81-82.  Dr. Wysong did not use the "variety" label because Freeman had advised that the term would have a bad impact on the market; Wysong will not use the term in a product description now, he says, because the defendants began producing a "Nature's Variety" pet food line in 2002. *Id*. at  67-69.

Sometime in 1999, Dr. Wysong requested that Freeman find someone to purchase Wysong Corporation.  Pl.'s Resp. Ex. E, Scott Freeman Dep. at 41.  Thereafter, Freeman introduced the plaintiff to Robert Milligan, the president of defendant M.I. Industries ("M.I.").  The plaintiff and

-3-

M.I. began purchase negotiations in 1999.  M.I. agreed to a confidentiality agreement dated May 6, 1999 to facilitate the talks, which states in part:

> 1.  <u>Confidential Information</u>.  RW [Dr. Randy Wysong] shall deliver to MI certain information, which may include, but not be limited to, financial information, copies of agreements, production and marketing plans, technical information, customer lists, and other information concerning RW's conduct of his business.  All of such information ("Confidential Information") is confidential and proprietary to RW and his affiliates.

> 2.  Obligations Relating to Confidential Information.  With respect to the Confidential Information, MI warrants and represents the following:

> (a) MI will limit access to the Confidential Information to itself and to only those individuals who have a need for such access in order to enable MI to work with RW. Individuals within MI's organization and its attorneys and professional advisors will use the Confidential Information only for working with RW and MI and for no other purpose.

> (b) Upon request of RW, MI shall return all of the Confidential Information, including all copies thereof, and related materials prepared by MI and RW reflecting the Confidential Information.

> (c) MI and RW acknowledge that their businesses are unique, and agree that in no event will they make any use of the Confidential Information to develop or operate a business that is competitive with each other's businesses and will not disclose the Confidential Information to anyone without each other's written authorization.

> . . .

> 4.  <u>Nonapplicability</u>.  MI's and RW's obligations under this Agreement shall not apply to any information which: (a) was or becomes published, or can reasonably be considered part of the public domain; (b) was previously known by MI or RW prior to the receipt of such confidential information; or (c) subsequent to disclosure, is obtained or developed by MI or RW or any affiliate or subsidiary of MI or RW through independent research without use of the disclosed information or from a third party having an independent right to disclose such Confidential Information.

> . . .

Defs.' Mot. Summ. J. Ex. 4, Confidentiality Agreement (May 6, 1999) at 21-23.  In addition, the

plaintiff contends that M.I. entered into another confidentiality agreement dated on the next day, but

only Dr. Wysong signed the document.  *Id.*, Confidentiality Agreement (May 7, 1999) at 20.  The

plaintiff alleges that Freeman agreed to essentially the same confidentiality agreement over a year

after he started employment with the plaintiff.  Freeman's agreement, which is dated May 7, 1999,

states:

> Scott Freeman desires financial and other business information from Wysong
> Corporation (WC) to determine the feasibility of purchasing parts of Wysong
> business.
>
> WC considers all information not published in Wysong literature, including even
> consideration to sell parts, to be sensitive and proprietary.
>
> Scott Freeman agrees to hold all such information confidential unless written
> authorization is given for specific named exceptions.  If such exceptions are
> permitted, Scott Freeman will take full responsibility for their adherence to this
> Agreement.
>
> All documents from WC and any copies will be deleted or returned immediately by
> Scott Freeman at WC's request.
>
> WC will be entitled to damages for any unauthorized party receiving confidential
> WC information through Scott Freeman.  Such relief to WC will not require proofs
> of financial loss by WC.
>
> Should breach of this agreement occur, and the parties are not able to resolve matters
> between them, WC and Scott Freeman agree to arbitration/mediation by the
> American Arbitration Association in Midland, MI.

*Id.*, Confidentiality Agreement (May 7, 1999) at 18.  In addition to the Confidentiality Agreement,

Dr. Wysong believed that he had both implicit and explicit agreements with Freeman to keep secret

anything that Freeman did not discover in the public forum.  Pl.'s Resp. Ex. B., Dr. Wysong Dep.

at 120.

The 1999 negotiations did not last long, but purchase negotiations resumed in the summer of 2000. *Id*. at 38. On September 15, 2000, Freeman signed another confidentiality agreement with the same terms as the agreement that he allegedly agreed to earlier. Def.'s Mot. Summ. J. Ex. 4, Confidentiality Agreement (Sep. 15, 2000) at 19.

Freeman continued his sales and consulting work for the plaintiff throughout the purchase negotiations. Pl.'s Resp. Ex. E., Freeman Dep. at 8. In the summer of 2000, Freeman met with M.I. for the purpose of creating a business plan for M.I. to purchase the plaintiff. This was the only meeting between Freeman and M.I. during the negotiations. *Id*. at 42. Freeman advised M.I. of his beliefs about the status of the sale, the price of Wysong Corporation's plant, and how best to approach Dr. Wysong to facilitate the sale. Second Amended Compl. Ex. B, E-mails.[1] The plaintiff alleges that by December 2000 Freeman was secretly providing M.I. with confidential company information, including an estimated revenues for the 2000 calendar year and projected earnings for 2001. *Id*. Ex. A, Facsimile from Freeman to Mulligan (Dec. 3, 2000). By March of 2001, the defendants were secretly working on a line of products to compete with the plaintiff. *Id*., Ex. C, E-mails. During the summer of 2001, Freeman further advised M.I. that Wysong Corporation's packaging did not accurately represent its products. Pl.'s Resp. Br. Ex. E., Freeman Dep. at 34. He believed that to adhere to the representations on Wysong Corporation's packages the food required fresh meat ingredients, not meat meal. *Ibid*. He recommended that M.I. not proceed with the proposed purchase for that reason. *Ibid*. One e-mail Freeman sent to M.I. prior to an M.I. meeting with the plaintiff stated, "He [Dr. Wysong] is always talking about proprietary information,

---

[1]The Court presumes that the e-mail address "Sfree4" refers to Scott Freeman and "Mesg2Bob" refers to Bob Milligan of M.I.

concerned that Wysong's secrets will get out.  This has to be linked with [b]ogus/untruthful ingredient lists," and "[h]as problems with due diligence in providing documented proof of P & L." Second Amended Compl. Ex. D, E-mail (May 15, 2001).  There is evidence that Dr. Wysong knew that Freeman was talking with M.I. about the deal.  Def.'s Mot. Summ. J. Ex. 4, E-Mail (Aug. 17, 2000) at 67-69.[2] Dr. Wysong apparently attempted to maintain confidentiality by controlling what information he disclosed to Freeman and M.I. and warning Freeman not do disclose secret information to M.I.  *Ibid.*[3]

Purchase negotiations between the plaintiff and M.I. ceased in late 2001.  M.I. told Dr. Wysong that it did not receive "enough financial information to place a value on the company," such as tax return information.  Defs.' Reply Ex. 10, Dr. Wysong Dep. at 131-32.

Apparently, the negotiations were not fruitless: the plaintiff alleges that M.I. produced some products for plaintiff from November 20, 2001 through December 12, 2001 and shipped orders for plaintiff from November 30, 2001 through February 8, 2002.  Around the time the parties abandoned their negotiation efforts, Freeman withdrew from his employment contract with the plaintiff and went to work for M.I.; he formally started working for M.I. in September 2001.  The defendants then allegedly began selling products and distributing advertising literature infringing Wysong Corporation's trade dress, prompting the plaintiff to write a letter to its distributors urging them to refrain from working with the defendants.  Defs.' Mot. Summ. J. Ex. 6, Letter from Pl. to distributors (Feb. 14, 2002).  A Wysong Corporation employee, Linda Due Yoder, stated in a

---

[2]  The parties to these e-mails are unlabeled.  *See* Defs.' Mot. Summ. J. Ex. 4, Interrogs. ¶ 7.

[3]  The parties to these e-mails are unlabeled.

deposition that several Wysong Corporation distributors telephoned Wysong Corporation in February 2002 to complain about Freeman. According to Yoder, Freeman solicited Wysong Corporation's customers with products created by M.I. She alleges Freeman would offer to "throw on some Nature's Variety onto the order with our, the Wysong order" when delivering Wysong Corporation's product under the agreement between the two companies. Pl.'s Resp. Br. Ex. C, Linda Sue Yoder Dep. at 15-16. Dr. Wysong, in his deposition, stated that distributors told him that Freeman said his products were "just like Wysong or better" and M.I. would be spending millions of dollars on marketing. Defs.' Reply Ex. 10, Dr. Wysong Dep. at 54.

The plaintiff filed its complaint on June 17, 2002, and first amended complaint on October 3, 2002 alleging five counts: (1) misappropriation of trade secrets, (2) unjust enrichment, (3) conspiracy, (4) breach of fiduciary duty, and (5) "palming-off" products. The plaintiff alleges that the defendants improperly used confidential information provided by the plaintiff. Wysong Corporation's putative trade secrets allegedly include: Dr. Wysong's pet feeding concepts, terms Dr. Wysong contemplated using to brand his products, financial information, packaging techniques, and customer and supplier information. The plaintiff alleges that the defendants worked together to misappropriate trade secrets and create a competing product line and the defendants copied two specific packages, a product sold in a sealed pouch and another in a small "tub." Dr. Wysong states that the defendants copied "the philosophy, the nutritional approach, . . ., the selection of products, the way that the labels look, the selection of ingredients, the terminology on the food." Defs.' Reply Br. Ex. 10, Dr. Wysong Dep. at 88-90. The plaintiff lists various ideas and words allegedly "lifted" verbatim from Wysong Corporation's products and advertising literature:

| **Wysong Terms** | **Defendants' Terms** |
|---|---|
| Tundra | Prairie |
| Fresh | Fresh |
| Free Range | Free Range |
| Over 70 organic chelated minerals | Over 70 organic chelated minerals |
| Sprouts | Sprouts |
| No synthetic vitamins and minerals | No synthetic vitamins and minerals |
| 7 oz., 14 oz., 5# chubs | 7 oz., 14 oz., 5# chubs |
| Whole | Whole |
| Nature's Choice | Nature's Variety |
| Feed in "Variety" | Variety |
| Rotate Freely | Rotate Freely |
| Optimal Nutrition | Optimal Nutrition |
| Fresh meats | Fresh meats |
| Whole grain- not fractions | Whole grain- not factions |
| Heat sensitive ingredients | Heat sensitive ingredients |
| Dry enrobed | Dry enrobed |
| Probiotics | Probiotics |
| Enzymes | Enzymes |
| Herbal extracts | Herbal extracts |
| Oxygen barrier foil packaging | Oxygen barrier foil packaging |
| Fruit extracts | Fruit extracts |
| Natural source glucosamine, chondroitin, colostrum | Natural source glucosamine, chondroitin, colostrum |
| Whole Food Concentrate | Whole Food Blend |
| Rosemary & natural tocopherols | Rosemary & natural tocopherols |
| Cat litter | Cat litter |
| Enhanced Forage | Prairie Forage |
| Equine | Equine |
| Optimal | Optimum |
| Negative effects of heat processing | Negative effects of heat processing |
| Rotate diets | Rotate diets |
| Exclusive feeding has negative effects | Exclusive feeding has negative effects |
| Canine/Feline | Canine/Feline |

Pl.'s Resp. Ex. F, Table of Terms.  Finally, the plaintiff claims that the defendants are exploiting

Freeman's relationship with Wysong Corporation by publicizing Freeman's position with Wysong

Corporation in sales literature.

     The defendants filed counterclaims on October 3, 2002 alleging that the plaintiff and Dr.

Wysong published false and defamatory statements about the defendants and intentionally interfered

with a contract, business relationship, or expectancy of the defendants.  However, the Court dismissed the counterclaims against Dr. Wysong on November 12, 2002 according to the parties' stipulation.

After the close of discovery, the defendants filed a motion for summary judgment on April 11, 2003.  The defendants argue that Michigan's Uniform Trade Secrets Act displaces all of the plaintiff's claims except the misappropriation claim and the plaintiff failed to present evidence showing issues of material fact on the other claims.  The plaintiff then filed a response to the motion for summary judgment, and the Court heard oral argument on the motion for summary judgment on September 11, 2003.  Subsequently, the Court authorized the plaintiff's filing of a second amended complaint dated September 19, 2003 and the defendants' filing of a supplemental brief.  The plaintiff's second amended complaint included a sixth count alleging a violation of duty of loyalty asserting allegations that Freeman secretly provided information concerning the sales negotiations and the plaintiff's products to enable the creation of a competing product line while Freeman still employed by Wysong Corporation.

## II.  Discussion

Although the defendants style their motion in the alternative as a motion to dismiss, the liberal references to matters outside the pleadings preclude its consideration as such.  *See Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (holding that if matters outside the pleadings must be considered in ruling on the merits of the claim, the motion more properly should follow the standards and procedures of Rule 56, and reviewing courts generally will treat the motion as one for summary judgment).  Therefore, the Court will treat the motion under Federal Rule of Civil Procedure 56.

A motion for summary judgment under Rule 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148  (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

Once the defendants have pointed out the deficiencies in the plaintiff's case, it is incumbent upon the plaintiff to come forward with evidence establishing a material fact on the issue. *Anderson*, 477 U.S. at 252. The Court is not obliged to "comb through the record to ascertain whether a genuine issue of material fact exists." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 407, 410 (6th Cir. 1992)). Likewise, the moving party must reasonably identify those portions of the record upon which it relies. Simply attaching voluminous exhibits and stating that the necessary information may be found somewhere in the documents will not suffice. In this case, both parties have left the Court with a challenge by their failure to regularly support their claims by providing pinpoint citation to facts. For example, the defendant regularly cites to the whole of its exhibit 4, which has almost 80

-12-

pages.  The plaintiff only cites to Dr. Wysong's deposition in four places to support its trade secret claim and makes no mention of the e-mails attached to the complaint.

The party who bears the burden of proof must present a jury question as to each element of the claim.  *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### A.  Displacement of Remedies by the MUTSA

The defendants argue that the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1901 *et seq.*, displaces the claims of conspiracy, breach of fiduciary duty, unjust enrichment, and "palming off."  The plaintiff has included a count in its amended complaint for misappropriation of trade secrets.  But even absent that claim, a specific provision in the MUTSA extinguishes certain torts formerly recognized at common law.  Section 8 of the Act states:

> (1)  Except as provided in subsection (2), this act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
>
> (2)  This act does not affect any of the following:
> (a)  Contractual remedies, whether or not based upon misappropriation of a trade secret.
> (b)  Other civil remedies that are not based upon misappropriation of a trade secret.
> (c)  Criminal remedies, whether or not based upon misappropriation of a trade secret.

Mich. Comp. Laws § 445.1908.

The plaintiff contends that its other claims are independent of the misappropriation claims under the MUTSA: the claim for breach of fiduciary duty includes an allegation that the defendants improperly failed to disclose the formation of an entity intended to compete with the plaintiff while the parties were still associated together; the "palming off" claim has elements distinct from the

elements showing misappropriation; and although the unjust enrichment and conspiracy claims are partially displaced by misappropriation, the defendants' unjust enrichment and conspiracy are separable from misappropriation to the extent that they relate to breaching fiduciary duties and "palming-off" pet food products.

The MUTSA displaces claims that are "based solely upon the misappropriation of a trade secret." *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003) (compiling cases interpreting displacement under various versions of state UTSAs). In other words, claims "based upon wrongful conduct independent of the misappropriation of trade secrets" are not displaced. *Id*. at 950. "In determining whether a claim is displaced, courts generally examine whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be dismissed." *Id.* at 946.

For instance, in *CMI Int'l, Inc. v. Internet Int'l Corp.*, 251 Mich. App. 125, 132, 649 N.W.2d 808, 812-13 (2002), the plaintiff filed a complaint against a former employee and the competitor that hired the employee alleging misappropriation under the MUTSA and other claims. The Michigan appellate court held that claims of unjust enrichment and constructive trust, breach of trust and fiduciary duty, and conspiracy were "conflicting" within the meaning of the MUTSA, finding that those "claims necessarily are based on Michigan's USTA, because that statute displaced conflicting tort remedies for misappropriation of a trade secret." *Ibid.* However, in *Bliss Clearing Niagara, Inc.*, the plaintiff, Bliss, filed various claims against defendant Midwest Brake's for improper use of the "Tor-Pac 40" product name and using confidential information to manufacture and sell that product. 270 F. Supp. 2d at 945. The court held that although some of the claims founded on

-14-

misappropriation – such as

soliciting business with stolen information – were displaced under the MUTSA, Bliss' claims for

tortious interference and unfair competition survived because they were based on allegations that

Midwest Brake used the "Tor-Pac 40" product name and some design information for making a

confusingly similar product. *Id.* at 949-50.

In this case, the "palming-off" claim is similar to the unfair competition claim that the court

in *Bliss Clearing Niagara* determined was not displaced by the USTA. The essence of that claim

relates to an allegation that the defendants are selling confusingly similar products. The claim is not

based factually or legally on the misappropriation of secret information. The "palming-off" claim

is not displaced by the MUTSA.

A claim for breach of fiduciary duty and breach of duty of loyalty is really the opposite of

a misappropriation claim in that it is the agent or employee that withholds information or conceals

activity of his own when the relationship gives rise to a duty to disclose, whereas the essence of a

misappropriation claim is the theft of the employer's information. An employee breaches a duty of

loyalty, for example, by competing against his employer without fully disclosing the his interest in

the competing enterprise. *See Kingsley Assocs., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1283 (6th Cir.

1990) (quoting *Sweeney & Moore v. Chapman*, 295 Mich. 360, 363, 294 N.W. 711,712-13 (1940)

(stating that "[t]he general rule is that a broker forfeit[s] his right to compensation by misconduct,

breach of duty, or wilful disregard, in a material respect, of an obligation imposed upon him by the

law of agency. A corollary of this rule is that the law will not permit an agent to act in a dual

capacity in which his interest conflicts with his duty, without a full disclosure of the facts to his

principal") (citations and quotations omitted)); *In re Hanson*, 225 B.R. 366, 375 (Bkrtcy. W.D.

Mich. 1998) (applying Michigan law and holding that "[t]he common law imposes a duty of loyalty on employees, forbidding them from taking action contrary to the interests of their employers"); Restatement (Second) of Agency § 387 (1958) (stating "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency").  Similarly, a breach of fiduciary duty occurs when a fiduciary relationship, which "arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another," is "abused, or when confidence has been reposed and betrayed."  *Vicencio v. Ramirez*, 211 Mich. App. 501, 508, 536 N.W.2d 280, 284 (1995) (citing *Ulrich v. Federal Land Bank of St. Paul*, 192 Mich. App. 194, 196, 480 N.W.2d 910, 911 (1991)).

The allegations supporting these claims in this case are not based on the misappropriation of Wysong Corporation's secret information.  Instead, both of these claims are based on general allegations that Freeman was secretly working with M.I. to create a competing product line while employed by the plaintiff.  The plaintiff alleges:

> 11.  That as indicated by the correspondence from Freeman to M.I. Industries president Robert Milligan attached hereto as Exhibit "A," by at least December of 2000 Freeman was secretly working with M.I. Industries in connection with the proposed purchase of a portion of Plaintiff's business.
>
> 12. That as indicated by the correspondence from Freeman to Milligan collectively attached here to as Exhibit "B," Freeman continued through out the first half of 2001 to secretly provide information to Milligan to assist M.I. Industries in their negotiations with Plaintiff.
>
> 13. That as indicated by the correspondence from Freeman to Milligan collectively attached hereto as Exhibit "C," by at least March of 2001 Defendants were secretly working on a line of products directly competitive to the products manufactured and marketed by Plaintiff.

Second Amended Compl. ¶¶ 11-13.  These allegations claim that Freeman and Milligan were surreptitiously working to take advantage of a corporate opportunity and thereby breached a fiduciary duty and a duty of loyalty; the claims are not displaced by the MUTSA.

The unjust enrichment and conspiracy claims, on the other hand, are based on the wrongful taking of Wysong's corporate opportunity *and* the theft of secret information, and consequently are displaced in part.  The unfair competition claims related to the sale of deceptively similar products incorporate paragraphs one through thirty-one, including the allegations of unjust enrichment and conspiracy.  Under Michigan law, the elements of an unjust enrichment claim are "(1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain."  *Dumas v. Auto Club Ins. Ass'n*,  437 Mich. 521, 546, 473 N.W.2d 652 (1991) (citation omitted). To state a civil conspiracy cause of action under Michigan law, "a plaintiff need only allege that the defendants were jointly engaged in tortious activity as a result of which the plaintiff was harmed."  *Abel v. Eli Lilly and Co.*, 418 Mich. 311, 338, 343 N.W.2d 164, 176 (1984). The plaintiff has pleaded claims of unjust enrichment and conspiracy based on the alleged sale of deceptively similar products, which are wrongful acts independent of misappropriation.  *See Bliss Clearing Niagara, Inc.*, 270 F. Supp. 2d at 950.  Also, the unjust enrichment and conspiracy claims survive to the extent that they are based  on allegations of paragraph thirteen, alleging breaches of duty for creating a product line.  Second Amended Compl. ¶ 13.  However, the MUTSA displaces the portion of the unjust enrichment and conspiracy claims that allege enrichment from misappropriation.

### B.  Misappropriation Claims

The defendants contend that the plaintiff's claim under the MUTSA must fail because the information alleged to be secret – the pet food formulas and concepts – were disclosed in articles published by Dr. Wysong and known in the pet food industry.  They also contend that the alleged trade secrets were disclosed in information that the plaintiff gave to its distributors in advertising literature.  The defendants argue that information related to the plaintiff's distributor and merchant list was personally compiled by Freeman through his work with the plaintiff and the information was publically ascertainable in public forums and meetings such as conventions and trade shows.  They attack the plaintiff's claim by citing the absence of proof that the material at issue is either confidential or protected because, they claim, the plaintiff failed to take any significant steps to guard the purported secret information.  Finally, the defendants allege that the plaintiff cannot demonstrate that either Freeman or M.I. actually misappropriated any information.  For example, Dr. Wysong stated to other distributors that Freeman was not an "insider" of Wysong Corporation, and that the plaintiff's alleged secret information could not have been disclosed to him.

The plaintiff counters those arguments by asserting that statements of Dr. Wysong in deposition demonstrate a genuine issue of material fact whether the asserted information constitutes trade secrets, was misappropriated by the defendants, and was used by the defendants in unfair competition.  The plaintiff alleges that only after Freeman was told that it was developing a "forage" product did the defendants release a "prairie forage" product.  As for its efforts to protect the trade secrets, the plaintiff asserts that its suppliers have signed confidentiality agreements, and as a result, the defendants could only learn of the plaintiff's suppliers through association with the plaintiff.

-18-

Moreover, the plaintiff contends that the defendants received marketing information from Wysong

Corporation that was unavailable to the public.

> The MUTSA defines a "trade secret" as
>
> information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902.   Michigan courts use the following factors to determine if

information is a trade secret:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owner and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Compuware Corp. v. Serena Software Int'l, Inc.*, 77 F. Supp. 2d 816, 820 (E.D. Mich. 1999); *see*

*also Hayes-Albian v. Kuberski*, 421 Mich. 170, 182, 364 N.W.2d 609, 614 (1984).  Under Michigan

law, "[t]o be a trade secret, the information must, of necessity, be a Secret."  *Kubik, Inc. v. Hull*, 56

Mich. App. 335, 347, 224 N.W.2d 80, 87 (1974); *see* Mich. Comp. Laws § 445.1902 .  Trade secrets

do not "encompass information which is readily ascertainable, i.e., capable of being acquired by

competitors or the general public without undue difficulty or hardship."  *Kubik, Inc.*, 56 Mich. App.

at 348, 224 N.W.2d at 87; *see* Mich. Comp. Laws § 445.1902(d)(i); *see Hayes-Albion*, 421 Mich.

at 182-83, 185, 364 N.W.2d at 615 (evaluating the "time, money and effort" expended in developing

information when analyzing whether to characterize the information as a trade secret).  "Sufficient

measures" taken to protect the secrecy of such confidential information have been found to include

> either an express agreement between the employer and employee restricting or
> prohibiting disclosure by the latter to third parties; a disclosure by employer to
> employee in confidence or with a tacit understanding, inferable from the attendant
> circumstances, that the information is confidential; or security precautions utilized
> by the employer to insure that only a limited number of authorized individuals have
> access to the information.

*Kubik*, 56 Mich. App. at 347-348, 224 N.W.2d at 87.

> Misappropriation occurs upon
>
> (i) Acquisition of a trade secret of another by a person who knows or has reason to
> know that the trade secret was acquired by improper means[; or]
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent
> by a person who did 1 or more of the following:
>
> (A) Used improper means to acquire knowledge of the trade secret.
>
> (B) At the time of disclosure or use, knew or had reason to know that his or her
> knowledge of the trade secret was derived from or through a person who had utilized
> improper means to acquire it, acquired under circumstances giving rise to a duty to
> maintain its secrecy or limit its use, or derived from or through a person who owed
> a duty to the person to maintain its secrecy or limit its use.
>
> (C) Before a material change of his or her position, knew or had reason to know that
> it was a trade secret and that knowledge of it had been acquired by accident or
> mistake.

Mich. Comp. Laws § 445.1902(b).

The plaintiff acknowledges that Dr. Wysong made statements that Freeman was not privy

to proprietary information.  *See* Defs.' Reply Ex. 10, Dr. Wysong Dep. at 107; Defs.' Mot. Summ.

J. Ex. 6, Letter from Pl. to distributors (Feb. 14, 2002).  However, Wysong contends that the letter

to suppliers was mere puffing, and other evidence creates a fact issue on whether many of Dr.

Wysong's ideas and concepts were trade secrets under Michigan law.

-20-

1.  Pet Feeding Concepts

With respect to the composition of the pet food itself, Dr. Wysong alleges that the defendants misappropriated his "concept" or "philosophy" for making pet food, not a specific formula or recipe. However, according to the evidence presented, Dr. Wysong's concept of healthy pet food and his design philosophy are hardly secrets. In fact, the uncontroverted evidence is that Dr. Wysong has published extensively on the subject of his pet feeding concept and concedes that the concepts, along with his food ingredients, were publicly available. *See* Defs.' Reply Ex. 10, Dr. Wysong Dep. at 69-70, 91, 110. In addition to disclosure through publication, the plaintiff discloses Dr. Wysong's pet feeding concepts as a general marketing device for selling pet food. The back of his archetypical pet food package contains the following statement:

– WYSONG PHILOSOPHY –

Wysong Corporation's purpose is to create products and educational aids to enhance the health of humans, animals, and the environment.

Wysong Diets have emerged from this commitment and are part of an advanced Optimal Health Program$^{TM}$ scientifically developed by Wysong and refined since 1979.
Please visit our website or request literature to learn more about our extensive range of products and the unique health-first philosophy from which they emerge.

Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 50. The plaintiff has marketing pamphlets containing detailed discussions of Dr. Wysong's philosophy. Although the plaintiff claims to be an innovator in the industry, he has not kept those innovations secret. Since the essence of a misappropriation claim under the MUTSA is the theft of trade *secrets*, the Court finds that the plaintiff cannot maintain such a claim based on misappropriation of Dr. Wysong's concepts and philosophy.

-21-

## 2. Plaintiff's Marketing Terms

For the same reason, the plaintiff's misappropriation claim based on the defendants' use of specific terms that Dr. Wysong conceived for marketing premium pet food products fares no better. Dr. Wysong testified that the terms "variety" and "forage" were his ideas and they were communicated to Freeman in confidence and, to his disappointment, eventually used in M.I.'s product lines. Those terms, however, are not unique, but rather are descriptive of features that could be developed by others without too much imagination or innovation. Under Michigan law, a trade secret cannot consist of "information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship." *Kubik, Inc.*, 56 Mich. App. at 348, 224 N.W.2d at 87. The point is illustrated by *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004). In that case, an author asserted that his poem and screenplay were trade secrets. The court found that the poems incorporated themes and ideas common throughout literature, such as "saving the world, the battle between good and evil, sibling rivalry or familial secrets and issue." *Id*. at 297. The court also found that figures described as "odd, misfit, evil, or conflicted" had well-known character traits. *Ibid.* (quotation marks omitted). Applying Michigan law, the Sixth Circuit found that the poem and screenplay were readily ascertainable for use in creating written works and were not protectable as trade secrets. *Id.* at 305.

Wysong Corporation's terms – "variety" and "forage" – are readily ascertainable for marketing healthy pet food. The term "forage" literally means "food for horses or cattle; fodder, provender." Compact Oxford English Dictionary 618 (2d ed. 1999). The term "variety," a commonly used term, is well known for use in marketing food products. *See Burke v. Dawn Donut Systems, Inc.*, 147 Mich. App. 42, 46, 383 N.W.2d 98, 101 (1986) (considering the trademark

-22-

"Variety Doughnuts").   In fact, the plaintiff publically uses the terms for their ordinary meaning in its current marketing.  The plaintiff uses forage as the name for its horse feed product.  Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 14.  It also uses the "variety" term in general reference to its products: its promotional literature states "[v]ariety is the spice of health," Pl.'s Resp. Ex. G, and "[d]esigned to be freely rotated for variety and maximum nutrition."  Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 38.   Moreover, the plaintiff failed to demonstrate that it invested any time or research into the developing the terms.  *See Hayes-Albion*, 421 Mich. at 182-183, 185, 364 N.W.2d at 615 (evaluating the "time, money and effort" expended in developing information when analyzing whether to characterize the information as a trade secret).  The plaintiff's MUTSA claim fails with respect to its marketing concepts.

### 3.  Packaging Techniques

Dr. Wysong alleges that his packaging product preparation methods are protectable trade secrets.   The defendants challenge this claim as well, arguing that the plaintiffs' preparation techniques are publically available or easily ascertainable.  However, Dr. Wysong testified that he developed secret packaging techniques for his premium pet food products, and he invested "time, money, and effort to develop the processes and equipment, that the processes and equipment gave the plaintiff a competitive edge." *Hayes-Albion*, 421 Mich. at 182-83, 364 N.W.2d at 615; *see* Defs.' Reply Ex. 10, Dr. Wysong Dep. at 91-92.  There is sufficient evidence that  packaging technology described by Dr. Wysong is the type of information protected by trade secret law.  The value of the packaging can be inferred from the fact that Wysong Corporation advertises its packaging to consumers, one advertisement states "Dry diets have Nutri-Pak™ oxygen- and light-barrier packaging, and fats and oils purged of oxygen by special processing." Defs.' Mot. Summ. J. Ex. 4,

Interrogs. at 38. Moreover, the plaintiff has submitted evidence demonstrating that it took some steps to protect this technology: it required its suppliers, employee, Freeman, and M.I. to sign confidentiality statements; and the plaintiff does not permit visitors inside its plant. *Id.*, E-mail Dr. Wysong to Mulligan (June 14, 2001) at 76.

Despite Wysong Corporation's measures to protect the packaging technology, however, the defendants are entitled to summary judgment on this part of the claim because the plaintiff has failed to offer any evidence that the technology has been used, disclosed, or acquired. *See Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F. Supp. 2d 808, 824 (E.D. Mich. 2000) (finding no misappropriation where alleged trade secret was not used or disclosed to defendants). Although the defendants touted their own packaging techniques, they did use or refer to the plaintiff's technology. The defendants' description of its methods is as follows:

> [B]ecause Nature's Variety realizes how heat compromises many food components, several of these heat sensitive food ingredients are dry enrobed back on the outer surface of the finished product . . . All Nature's Variety products are naturally preserved with vitamins and herbal extracts and hermetically sealed in oxygen limiting, foil packaging

Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 28. This advertising language does not mention Wysong Corporation's techniques of "fresh batching," barrier packaging, or "natural oxidants." Evidence of photocopies of similar looking packages and the defendants' contact with Wysong Corporation's supplier, Evangers, does not demonstrate a similarity between the parties' packaging techniques.

### 4. Customer Contact Information

The Michigan Supreme Court has held that "there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment." *Hayes-Albion*, 421 Mich. at 183, 364 N.W.2d at 615. Thus,

customer lists developed by a former employee and information relating to a customer's needs are

not "trade secrets" under the MUTSA, *McKesson Medical-Surgical Inc. v. Bio-Medics, Inc.*, 266

F. Supp. 2d 590, 597-98 (E.D. Mich. 2003), unless the employee is bound by a confidentiality

agreement. *Hayes-Albion*, 421 Mich. at 184, 364 N.W.2d at 615. Freeman signed a confidentiality

agreement covering "all information not published in Wysong literature." Defs.' Mot. Summ. J. Ex.

4, Confidentiality Agreement (May 7, 1999) at 18. Nonetheless, the language in *Hayes-Albion*

suggests that for customer contact information a confidentiality agreement is a necessary but not a

sufficient condition for establishing a trade secret. The Sixth Circuit has interpreted this aspect of

the Uniform Trade Secrets Act under Kentucky Law and made the following observation:

> In determining whether information is readily obtainable by proper means, courts
> generally distinguish between, on one hand, lists of customers "discoverable only
> through extraordinary efforts and . . . through many years' expenditure of time and
> money," such as purchasers of HIV medications who value confidentiality, *see In re
> Am. Preferred Prescriptions v. Health Mgmt., Inc*., 186 B.R. 350, 356
> (Bankr.E.D.N.Y.1995), or the purchasers of unusual goods or services not generally
> known to an industry at large, *see Morlife v. Perry*, 56 Cal. App. 4th 1514, 66 Cal.
> Rptr. 2d 731, 735 (1997), and, on the other hand, lists of customers whose identities
> as purchasers of a given type of product may be obtained through such legitimate
> channels as telephone books, the internet, or by calling local businesses, *see, e.g.,
> UBS Painewebber, Inc. v. Aiken*, 197 F. Supp.2d 436, 447 (W.D.N.C.2002)
> (customer list not trade secret under statute almost identical to Kentucky Act despite
> attempts at secrecy, because information was readily available through independent
> development); *Novacare Orthotics & Prosthetics v. Speelman*, 137 N.C. App. 471,
> 528 S.E.2d 918, 922 (2000) (customer list not trade secret because information used
> to contact customers was "easily accessible to defendant through a local phone
> book").

*ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714

(6th Cir. 2005). The court affirmed summary judgment for the defendants in that case because the

plaintiff failed to show that the list of customers "was obtained through great effort or expense, or

that the names of the list were not discoverable from a telephone book or similar legitimate source."

*Ibid.*  The court noted that even the identity of individual contacts "can be ascertained simply by calling each shop and asking."  *Id.* at 714-15.

The unrebutted evidence in this case establishes that the names of the distributors were available "in public forums and meetings such as conventions and trade shows." Defs.' Mot. Summ. J. at 12-13.  In support of this assertion, the defendants provided a thirty-eight-page list of customers that distribute their products consisting of pet supply stores, including names, phone numbers, addresses, and websites, all of which was readily obtainable through publicly available means.  The plaintiff presents no evidence that the identities of its customers were obtained through great effort or expense or were obscure or confidential.  The defendants are entitled to summary judgment on this aspect of the MUTSA claim.

### 5.  Supplier Contact Information

Unlike the customer contact information, the plaintiff's supplier contact data meets the definition of a protectable trade secret.  The defendants argue that the plaintiff's supplier information was compiled by Freeman through his work and that the information was ascertainable in public forums and meetings such as conventions and trade shows.  However, the evidence creates a fact issue in this point.  Under Michigan law, supplier contact information is a protectable trade secret with or without a confidentiality agreement.  The *Hayes-Albion* court held:

> The information regarding sources of supply is perhaps most difficult of all to characterize.  Plaintiff experimented with materials and solutions to determine how to make the best product at the cheapest cost.  To the extent that defendants purchased from plaintiff's supplies materials to manufacture the same products made by plaintiff through use of the same processes employed by plaintiff, defendants are seeking to reap where they have not sown.

*Hayes-Albion*, 421 Mich. at 184-85, 364 N.W.2d at 616.  The court held that the supplier information was protectable when the defendant employee was exposed to the suppliers during the

-26-

course of his employment.  *Ibid*.  Here, the plaintiff submits evidence that it had a confidentiality

agreement with the defendants.

Moreover, the plaintiff can demonstrate that the information was not readily ascertainable.

Dr. Wysong testified:

> Q. . . . If I wanted to go to Evanger's [a supplier] and say I want to make pet food
> and I wanted to do that?
>
> A.  If you knew to fair [sic] that out.
>
> . . .
>
> Q.  Well, you would acknowledge the reality that these suppliers aren't sitting under
> bushes not showing their names to potential customers are they?
>
> A.  Some of them are quite obscure and none of them should be revealing that
> they're doing business with us.
>
> Q.  But conversely they can reveal certainly that they are willing to do cold packing
> for anyone that might ask them to do that?
>
> A.  I can't speak for them.

Defs.' Reply Ex. 10, Dr. Wysong Dep. at 118-19.

The defendants' assertion that supplier identities can be found by attending trade shows or

through public information sources demonstrates an issue of fact concerning the availability of the

plaintiff's supplier information.  Moreover, other evidence submitted by the plaintiffs demonstrate

that, even if the name of the supplier is available through public means such as a phone book,

supplier information may still be protectable.  Information concerning the capabilities and know-

how of the suppliers is valuable and something that Wysong Corporation and the supplier agreed

to keep secret by signing a confidentiality agreement.  Dr. Wysong testified that his company

expended effort developing technology with one of its packaging suppliers. *Ibid*. at 91-92, 117.

-27-

The plaintiff also submits information that it took steps to protect the information by making Freeman, other employees, M.I., and the suppliers sign confidentiality agreements. Defs.' Reply Ex. 10, Dr. Wysong Dep. at 118; Defs.' Mot. Summ. J. Ex. 4, E-mail to Scott Freeman (Sep. 13, 2000) at 68. Dr. Wysong specifically states that his confidentiality agreement with Freeman included supplier contacts. Defs.' Reply Ex. 10, Dr. Wysong Dep. at 120. Dr. Wysong made efforts to ensure the agreements were honored. He wrote to Freeman that, "[i]n any case this is our problem and between M&I and us. I do not want you distracted by such matters with so much you could be doing. Also, our suppliers, what they send us, etc., etc. is confidential,"and "[w]e consider our suppliers proprietary and confidential." Defs.' Mot. Summ. J. Ex. 4, E-mails to Scott Freeman (June 11, 2001 and July 6, 2001) at 73, 77.

Because there is an issue of fact on the critical elements of this aspect of the plaintiff's MUTSA claim, summary judgment may not be granted.

### 6. Financial Information

Although the defendants offer evidence showing that confidential financial information was never communicated to them, the plaintiff offered evidence of an e-mail in which Freeman summarizes projections for Wysong Corporation's sales in 2000. Freeman specifically qualifies his sales figures with comments that these are "my personal projections" and that he "would like us to seriously discuss what we could do if the above figures were to be an accurate forecast." Second Amended Compl. Ex. A, Facsimile from Freeman to Mulligan (Dec. 3, 2000). However, the memorandum provides a summary of all of Wysong Corporation's income and a projection as to how the income could increase. The summary names all of Wysong Corporation's market areas and resulting and projected sales in each area. A reasonable finder of fact could conclude that this

information, particularly the resulting 2000 figures, was confidential to Wysong Corporation and a trade secret.  The plaintiff has thus presented evidence demonstrating a factual issue that the defendants had access to or misappropriated financial information.  Likewise, the plaintiff offered evidence that it took measures to protect financial information similar to the measures taken to protect supplier information, and that Dr. Wysong made efforts to ensure the agreements were honored.  The defendants are not entitled to summary judgment on this aspect of the MUTSA claim.

### C.  Unjust Enrichment

Aside from the argument that the unjust enrichment claim is displaced by the MUTSA, the defendants also argue that the plaintiff conferred no benefit on them.  The plaintiff argues that there is a genuine issue of material fact that the defendants were unjustly enriched by Freeman's breach of duties and the defendants "palming off" products.  In *Hayes-Albion*, the court held that a defendant company "who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise."  *Hayes-Albion*, 421 Mich. at 187, 364 N.W.2d at 617 (citations and quotations omitted).

In this case, the plaintiff offers evidence that Freeman and M.I. were preparing a venture in competition with the plaintiff while Freeman still worked for and received compensation from the plaintiff.  An e-mail between Freeman and Mulligan provides evidence that Freeman was preparing a new line of premium pet food with M.I. while still associated with Wysong Corporation:

> Marge, at Evangers, is sending no later than tomorrow quotes on 14 oz and 5.5 oz cans. . . .
>
> I told her we are a new upstart company.  I gave her MI's fax, telephone, and company name of Natural Pet Products.  I also gave her Theron, Joe, and Greg (that's me, Gregory Scott Freeman) names as contacts. . . .

She was excited to talk to me and the possibility of doing business with us. . . .

Also, I want this to be my last show for Wysong coming up this weekend.

Second Amended Compl. Ex A., E-mail Freeman to Mulligan (Mar. 26, 2001). The plaintiff has demonstrated a genuine issue of material fact whether M.I. was unjustly enriched by Freeman's services and is liable with Freeman for the profits of their enterprise. The unjust enrichment claim therefore survives summary judgment.

### D.  Civil Conspiracy

The defendants also argue that the plaintiff has not proved that they ever agreed to commit an illegal act. A civil conspiracy is an agreement between two or more persons to accomplish some unlawful purpose through concerted activity. *Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999). Under Michigan law, "[i]t is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact. Furthermore, conspiracy may be established by circumstantial evidence and may be based on inference." *Temborius v. Slatkin*, 157 Mich. App. 587, 599, 403 N.W.2d 821, 827 (1987).

In this case, the acts and conduct of the defendants outlined earlier are sufficient to establish an inference of an agreement to accomplish some unlawful purpose. There is evidence the defendants conspired to create a venture that allegedly infringed on the plaintiff's trade dress. Freeman and M.I. may have prepared a joint venture to compete against the plaintiff in possible breach of Freeman's duties, leading to their unjust enrichment. Summary judgment on this claim is not appropriate.

E.  Breach of Fiduciary Duty and Duty of Loyalty

The defendants argue that their relationship with the plaintiff did not give rise to a duty of loyalty or as a fiduciary.  Under Michigan law, fiduciary duties flow "out of the relation subsisting between two persons of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith."  *Portage Aluminum Co. v. Kentwood Nat'l Bank*, 106 Mich. App. 290, 294, 307 N.W.2d 761 (1981).  Examples of fiduciary relationships are: "trustees to beneficiaries, guardians to wards, attorneys to clients, and doctors to patients."  *Ibid*.  Michigan courts have held that "whether there exists a confidential relationship apart from a well-defined fiduciary category is a question of fact."  *Fassihi v Sommers, Schwartz, Silver, Etc.*, 107 Mich. App 509, 515; 309 N.W.2d 645 (1981) (addressing "what duties, if any, an attorney representing a closely held corporation has to a 50% owner of the entity, individually").

Unless circumstances indicate otherwise, the employer/employee relationship alone generally does not give rise to fiduciary duties.  *See, e.g., Bradley v. Gleason Works*, 175 Mich. App. 459, 463, 438 N.W.2d 330, 332 (1989).  However, in the Sixth Circuit, there is no rule that a specific relationship may never be the basis of fiduciary obligations; rather, courts must look to the actual relationship between the parties.  *See ATC Distribution*, 402 F.3d at 715.

In this case, the plaintiff argues that it allowed M.I. to distribute its products, Freeman to sell its products and find a purchaser of the business, and allowed them access to confidential information.  The defendants argue that there is nothing inherently unique about the relationship between the potential purchase of a business such as M.I. and the plaintiff, and the facts do not demonstrate an agreement under which Wysong Corporation reposed any trust or confidence in the defendants.  The argument has merit with respect to M.I.  There is no evidence of a relationship that

-31-

the law recognizes as giving rise to a duty of loyalty or a fiduciary obligation.  The plaintiff did not disclose confidential information directly to M.I., according to Dr. Wysong.  Defs.' Reply Ex. 10, Dr. Wysong Dep. at 131-132.  Without more, the evidence that the plaintiff and M.I. engaged in purchase negotiations and M.I. acted as a distributor for the plaintiff is insufficient to demonstrate a fiduciary relationship between the two parties.

However, Freeman's relationship with the plaintiff was different than M.I.'s.  Freeman had access to confidential information, and he held himself out to be the plaintiff's national sales manager.  Second Amended Compl. Ex. A, Facsimile from Freeman to Mulligan (Dec. 3, 2000).  There is evidence that Freeman acted as the plaintiff's agent in the negotiations to sell the business.  The plaintiff also submitted evidence that Freeman may have breached a fiduciary duty when he advised M.I. not to purchase the business at a time when he was employed by the plaintiff and was asked to find a buyer for the company, he advised M.I. on his beliefs concerning the status of the sale, the price of Wysong Corp.'s assets, and tips for negotiating with the plaintiff, and secretly worked with the plaintiff on a line of products competitive with the plaintiff.

In addition, "[u]nder principles of agency, an agent owes his principal a duty of good faith, loyalty, and fair dealing."  *H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co.*, 234 Mich. App. 550, 574, 595 N.W.2d 176, 188 (1999).  The plaintiff has submitted evidence that Freeman breached this duty; specifically, Linda Yoder, a Wysong Corporation employee, testified that Wysong Corporation's customers were approached by Freeman soliciting sales for M.I.'s products when Freeman was an agent for M.I. acting as distributor for Wysong Corporation.  Pl.'s Resp. Ex. C, Linda Sue Yoder Dep. at 15-16.  In addition, Freeman's activities with M.I. while still associated with Wysong Corporation support the claim that he his duty of loyalty.

-32-

Summary judgment on this count will be granted as to M.I. but denied as to Freeman.

### F.  Confusing Packaging and Palming Off

The defendants argue that their packaging creates no consumer confusion because it distinctly contrasts with the plaintiff's packaging.  The defendants further contend that the similarity of the ingredients and nutritional information between its product and the plaintiff's product is insufficient to find consumer confusion.  The plaintiff argues that its "palming off" claim should survive summary judgment because the plaintiff does not have to show that the competing products are identical and that the issue of confusion created by the defendants' products should be decided by a finder of fact.

The "palming off" doctrine is a species of trademark infringement.  The Sixth Circuit has explained that "[i]n the first and most common type of infringement, similar marks on directly competing goods or services cause confusion over their origin. This situation is known as 'palming off,' because the defendant junior user misleads the public about the source of its goods or services, leading consumers to purchase the defendant's products in the belief that they are buying the plaintiff's."  *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002) (citing *Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987) (explaining that in "palming off," similar marks on competing goods "can cause the consumer to mistakenly buy the infringing defendant's product as the plaintiff's; the defendant tries to 'palm off' his goods as the plaintiff's")).

The plaintiff does not allege that the marks that it identifies with itself and its products are registered.  However, "[s]ection 43(a) of the Lanham Act provides a federal cause of action for infringement of an unregistered trademark which affords such marks essentially the same protection

as those that are registered." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 921 (6th Cir. 2003).

Michigan common law also protects unregistered trademarks. *Smith v. Imus*, 57 Mich. 456, 473, 24

N.W. 830, 837 (1885); *Smith v. Walker*, 57 Mich. 456, 458, 22 N.W. 267, 268 (1885) (denying an

appeal of an award for an injunction and accounting for infringement of an unregistered trademark);

Mich. Comp. Laws § 429. 44 ("Nothing contained in this act shall adversely affect the rights or the

enforcement of rights in marks acquired in good faith at any time at common law.").

When evaluating an infringement claim of an unregistered trademark, "courts must determine

whether the mark is protectable, and if so, whether there is a likelihood of confusion as a result of

the would-be infringer's use of the mark." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir.

2005). A putative trademark is unprotectable if it does not constitute a trademark or is not

distinctive. "The requirements for qualification of a word or symbol as a trademark can be broken

down into three elements: (1) the tangible symbol: a word, name, symbol or device or any

combination of these; (2) type of use: actual adoption and use of the symbol as a mark by a

manufacturer or seller of goods or services; (3) the function: to identify and distinguish the seller's

goods from goods made or sold by others." 1 J. Thomas McCarthy, McCarthy on Trademarks and

Unfair Competition § 3:1 (4th ed. 2004); *see Allard Enterprises, Inc. v. Advanced Programming

Resources, Inc.*, 249 F.3d 564, 572 (6th Cir. 2001) (holding that "[a]t common law, ownership of

trademark or service mark rights is obtained by actual use" and "[o]wnership rights flow only from

prior use--either actual or constructive."). Distinctive marks are legally protectable. *Tumblebus

Inc.,* 399 F.3d at 761. Some trademarks are inherently distinctive and others must acquire

distinctiveness. *Ibid*. The Michigan common law imposes the same requirements on a plaintiff

before a trademark is considered protectable. *See Interstate Brands Corp. v. Way Baking Co.*, 403

Mich. 479, 481, 270 N.W.2d 103, 105 (1978) ("The right to a trademark grows out of its use, and covers the area in which it is used."); *Smith v. Imus*, 57 Mich. at 474, 24 N.W. at 838 (Mich. 1885) ("If the name, device, or designation is purely arbitrary and fanciful, and has first been brought into use by him, his right to the exclusive use of it is unquestionable."); *Boron Oil Co. v. Callanan*, 50 Mich. App. 580, 583, 213 N.W.2d 836, 838 (1973) (holding that trademarks may acquire "a 'secondary meaning' when they have become associated in the minds of purchasers or customers with the source or origin of goods or services rather than with the goods or services").

In order to determine if similar marks can lead to confusion in the marketplace, courts in the Sixth Circuit are counseled to apply an eight-factor test:

> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.

*Therma-Scan*, 295 F.3d at 630 (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)). These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 646 (6th Cir. 1982) (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). No particular one of the eight factors is dispositive of the plaintiff's claim. *Ibid.* However, courts may evaluate the likelihood of confusion as a matter of law. *Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir. 2002). "Summary judgment for the defendant is appropriate if, upon consideration of all factors, the district court determines that no reasonable jury could fail to find that confusion of the marks would be likely." *Frisch's Restaurants, Inc.*, 670 F.2d at 646. Summary judgment is also

appropriate under the common law if a plaintiff fails to make a sufficient showing of confusion. *Weisman v. Kuschewski*, 243 Mich. 223, 230, 219 N.W. 937, 939 (1928) ("The failure to show confusion and deception of the public and consequent injury to plaintiffs precludes recovery on the ground of unfair competition.").

The plaintiff asserts three different groups of marks in its complaint. It says that the defendants (1) are using trademarks confusingly similar to its trademarks "Nature's Variety," "Prairie," and "Optimum," (2) have packaged their products in a manner designed to be confusingly similar to Plaintiff's packaging, and (3) distributed product literature confusingly similar with its product literature. Second Amended Compl. ¶ 35.

### 1.  Similar Trademark Brand Names

The Court finds no evidence to support the claim for protection of the trademark "Nature's Choice," which the plaintiff alleges will be confused with the defendants' "Nature's Variety" label. The plaintiff has not used the trademark "Nature's Choice" for over ten years. Defs.' Reply Br. Ex. 10, Dr. Wysong Dep. at 64. The plaintiff has presented no evidence of how it used the trademark, so there is no evidence that the defendants' mark will cause confusion.

The plaintiff contends that the defendants' "prairie" trademark is confusingly similar to its "tundra" trademark. The Court disagrees. The plaintiff has presented no evidence of the strength of its tundra mark. The pet food products associated with the trademarks, cat food sold in tubs, are related, but the prairie and tundra marks as they appear on the products are dissimilar: the legends are written with different fonts and are located next to the particular trademark of the party that produced the product. *See* Defs.' Mot. Summ. J. Ex. 4, Interrog. at 24. There is some evidence that the marketing channels are the same for the two competing products as the plaintiff alleges that M.I.

-36-

is soliciting its customers. *See Id.* Ex. 24, Interrog. at 59. The plaintiff did not present evidence of whether consumers are likely to be careful when purchasing premium pet food, but the Court recognizes that purchasers of premium goods are more likely to be discerning about their purchases. There is no evidence the brands will likely expand, outside of the general expectations that both companies harbor for their products. There is no direct evidence of M.I.'s intent in selecting the mark. Upon consideration of all the factors, the Court should find that "no reasonable jury could fail to find that confusion of the marks would be likely." The marks are dissimilar as used and there is no dependable indication of likely consumer confusion. *See Gray*, 295 F.3d at 646.

Finally, a reasonable jury will not find that the defendants' use of the optimum trademark will confuse consumers. The plaintiff has failed to present evidence of the strength of that trademark, evidence of actual confusion, likely degree of customer care, marketing channels, and likelihood of expansion of the product lines. The Court again notes that the consumers are likely to be careful with their purchases of these products, the two companies appear to use the same marketing channels for their products, and the parties expect their product lines to expand. There is some similarity between the optimum and optimal marks, giving some evidence of the defendants' intent in selecting the mark. *Id.* at 650. However, the products related to the marks are so different that confusion is unlikely. The plaintiff's Optimal is an encapsulated dietary supplement sold in units of a hundred capsules. *See* Defs.' Mot. Summ. J. Ex. 4, Interrog. at 13. The defendants' Optimum is horse food made of an oats and orchard grass formula and sold in units of forty-pound bags. *Id.* at 10. No reasonable jury would find that a consumer is likely to confuse a dietary supplement with a large bag of horse food, especially in light of the absence of evidence related to the other confusion factors.

-37-

2.  Packaging

The plaintiff alleges that the defendants infringed two types of pet food packages.  The first is sealed pouch containing a product called Archtype$^{TM}$.  Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 49-50.  The front-side top-half of the silvery-gray colored pouch has the plaintiff's general trademark displayed.  The product name is printed below the mark along with the product weight and other general information.  The back of the plaintiff's pouch has two columns of text describing the ingredients, directions, and Wysong Corporation's pet feeding philosophy.  M.I.'s competing product is packaged in a silvery pouch with its trademark and product information on the front.  *Id*. at 47-48.  The back of M.I.'s product has two columns of text.  Regardless of some similarity, however, the products convey distinct overall visual impressions.  The competitors both identify their products with their distinct trademarks on the front of their products.  The plaintiff's trademark on the front of the pouch includes a drawing of a person feeding a cat and dog; in contrast, the front of M.I.'s pouch displays a photographed image of a real cat and dog below its trademark.  The plaintiff locates the product name towards the bottom of the pouch; meanwhile M.I. locates the product name towards the top of the pouch.  Moreover, the text on the back of M.I.'s pouch lacks any description of their general philosophy.  The allegedly infringing pouch includes one full column of the product's ingredients and another column with product information written in French.  There is little danger of consumers confusing the source of the two products, and the defendants are entitled to judgement as a matter of law that the product does not infringe.

Second, the plaintiff alleges that "tubs" of three styles of its Tundra product are infringed by tubs of the defendants' products.  Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 24.  The layout of the elements on the lids is roughly similar.   The producer's trademark along with the name of the

product are similarly situated at the top of the label. *Ibid.* The ingredients, general instructions, feeding guide, guaranteed analysis and bar code, and producer's address are successively listed below the product name. *Ibid.* However, the differences in the overall visual impression of the representation of the product packaging in evidence indicates that it is unlikely consumers will confuse the products. The defendants' fourteen-ounce tub is twice the weight of the plaintiff's seven-ounce tub. *Ibid.* Both parties put their distinct trademarks and product names on the label. The plaintiff has inserted dividing lines between ingredients, general instructions, and feeding guide. *Ibid.* The labels disclose different details about the products near the bar codes. *Ibid.* The plaintiff's label provides refrigeration information below the feeding guide, while in the corresponding location the defendants' discloses that the product is made in the "USA" and is formulated to AAFCO dog and cat food nutrient profiles. *Ibid.* The court finds that the overall visual impression of these products are different and will grant summary judgment to the defendants on this claim.

### 3. Advertising Literature

The plaintiff asserts protection for its advertising literature in which it has used discrete terms, set forth in the table of terms, describing discrete elements of its products. It says that the defendants also use these identical terms in their literature. Pl.'s Resp. Ex. F, Table of Terms.

However, the plaintiff has not demonstrated that the defendants' literature will cause consumer confusion. The "overall visual impression" of the parties' advertising literature has little similarity and both companies prominently display their trademarks on the literature. In evidence are three samples of Wysong Corporation advertising literature. First, an advertising letter released by the plaintiff contains a dense, thorough description of Wysong Corporation's product and philosophy. Wysong Corporation clearly indicates the name of its products, Dr. Wysong's name,

and the company name on the first page of its advertising newsletter. Defs.' Mot. Summ. J. Ex. 4, Interrogs. at 32. The literature includes photographs of Wysong Corporation's pet food containers and demonstrative charts and tables. Most pages of the literature uses a three-column format with full text justification and dividing lines between each column. The final pages of Wysong Corporation's literature are different, displaying four Wysong Corporation products and containing scientific references. *Id*. at 36-37. The tops of these pages display Wysong Corporation trademarks. A second Wysong Corporation advertisement is comprised of a column with the Wysong Corporation name in capital letters at the top of the text. *Id*. at 38. A third advertisement bears the Wysong Corporation trademark in three locations over two pages and mentions either Wysong Corporation or the name of its archetype product in almost every sentence. *Id*. Ex. 9, at 1-2. In contrast, the defendants' literature makes prominent use of photographs of pets and raw ingredients for its products. *Id*. at 25-30. One page of their literature makes use of a three column format, but contains text that wraps around logos within the columns and no dividing lines. The defendants' literature states the trademark "Nature's Variety" at the start of almost every paragraph. Their trademark and a thematic diamond shape appear on most pages of the literature. No reasonable fact finder would discern that consumer confusion of the advertising literature is likely.

Even taking into account the substance of the advertising literature along with the visual elements, consumers are not likely to be confused as to the source of the products mentioned. The writing styles and arguments contained in the pamphlets are different. For example, Wysong Corporation relies more heavily on scientific evidence and include scientific references. The defendants discuss the merits of their frozen and canned products and includes these products in their recommended pet diets. Wysong Corporation does not appear to offer competing frozen or

canned products in its recommended pet diet.  In conclusion, there is "little danger of a consumer

picking up the two [product advertisements] and not quickly realizing that they emanate from

different sources that judgment as a matter of law . . . is appropriate."  *Abercrombie & Fitch Stores,*

*Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 648 (6th Cir. 2002).

Moreover, the plaintiff has presented no evidence of secondary meaning; therefore, the

literature is not entitled to protection.  Also, the elements of the plaintiff's literature are non-

functional because the defendants need use of the identified terms from the plaintiff's advertising

literature to compete effectively in the market for premium pet food.  Many of the terms on the

plaintiff's table of terms are used to identify the ingredients of the product: "Over 70 organic

chelated minerals," "Sprouts," "No synthetic vitamins and minerals," "Fresh meats," "Whole grain-

not fractions," "Probiotics," "Enzymes," "Herbal extracts," "Fruit extracts," "Natural source

glucosamine, chondroitin, colostrum," and "Rosemary & natural tocopherols,""Heat sensitive

ingredients," "Whole Food Concentrate," and "Chubs."  Some of the words are applicable for

describing healthy, premium foods: "Fresh,""Whole,""Heat sensitive ingredients," and "Negative

effects of heat processing."  The use of other terms specifically describe the pets that the food is

designed for: "Equine" and "Canine/Feline."  Specific weights of "7 oz." and "14 oz." are used to

describe quantities of food sold.  Some of the terms describe how the food product should be used

in combination with other foods "Feed in 'Variety,'" "Rotate Freely," "Rotate diets," "Exclusive

feeding has negative effects."  Some of the terms describe the packaging of the food "Oxygen barrier

foil packaging" and "Dry enrobed."  "Cat litter" is the name of a specific product used by pets.  In

sum, the words that the plaintiff seeks to protect are essential to selling the premium pet food

because they are needed to specifically describe the product and its packaging.  There can be no

protection for these terms because "few other verbal formulations adequately or efficiently convey [the] concept[s]" and there are a "lack of alternatives" to replace them. *Abercrombie & Fitch Stores, Inc.*, 280 F.3d at 643-44.

The Court finds, therefore, that the defendants are entitled to summary judgment on the plaintiff's "palming off" claim.

### III.

The Court finds that the defendants are entitled to judgment as a matter of law on the following claims: misappropriation of trade secrets on grounds of pet food concepts, marketing information, packaging information, and customer information; breach of fiduciary duty and duty of loyalty as to defendant M.I.; and confusingly similar trade dress and palming off. There are fact questions that preclude summary judgment on the following claims: misappropriation of financial and supplier information; unjust enrichment; conspiracy; and breach of fiduciary duty and duty of loyalty as to Freeman.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt # 24] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the following claims in the amended complaint are **DISMISSED** with prejudice: misappropriation of trade secrets on grounds of pet food concepts, marketing information, packaging information, and customer information as to all defendants; breach of fiduciary duty and duty of loyalty as to defendant M.I. Industries, only; and confusingly similar trade dress and palming off as to all defendants.

It is further **ORDERED** that counsel for the parties shall appear for a scheduling conference in chambers on **August 22, 2005 at 3:00 o'clock in the afternoon** to discuss further proceedings in this matter.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 29, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 29, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS

-43-